```
1                    UNITED STATES DISTRICT COURT
                     EASTERN DISTRICT OF NEW YORK
2

3   ----------------------------X
                                :
4   UNITED STATES OF AMERICA    :
                                :  10-MJ-189
5                               :
              v.                :  March 3, 2010
6                               :  Brooklyn, New York
    JAMES MALPESO,              :
7                               :
                 Defendant.     :
8   ----------------------------X

9

10       TRANSCRIPT OF CRIMINAL CAUSE FOR ARRAIGNMENT AND BAIL
              BEFORE THE HONORABLE VIKTOR V. POHORELSKY
11                 UNITED STATES MAGISTRATE JUDGE

12  APPEARANCES:

13

14  For the Government:         NICOLE ARGENTIERI, ESQ.
                                ASSISTANT U.S. ATTORNEY
15                              225 Cadman Plaza East
                                Brooklyn, New York  11201

16

17  For the Defendant:          VINCENT ROMANO, ESQ.

18

19

20
    Court Transcriber:          SHARI RIEMER
21                              TypeWrite Word Processing Service
                                211 N. Milton Road
22                              Saratoga Springs, New York 12866

23

24

25


    Proceedings recorded by electronic sound recording,
    transcript produced by transcription service
```

2

1    (Proceedings began at 12:00 p.m.)

2            THE CLERK: Criminal Cause for Arraignment, Case

3    Number 10-189-M, <u>United States v. James Malpeso</u>.

4            Counsel, please state your name for the record.

5            MS. ARGENTIERI:  Nicole Argentieri.  Good afternoon,

6    Your Honor.

7            MR. ROMANO:  Good afternoon, Your Honor.  Vincent

8    Romano for Mr. Malpeso.

9            THE COURT: Good morning.  Mr. Malpeso, the purpose

10   of the proceeding today is to insure that you understand the

11   charge that you face here.  I'll advise you of certain rights

12   you have as a defendant in a criminal case and we will address

13   whether bail can be set.

14           Mr. Romano, did you see a copy of the complaint?

15           MR. ROMANO: I have.

16           THE COURT: Did you review that with Mr. Malpeso?

17           MR. ROMANO: Yes.

18           THE COURT: Are you satisfied that he understands the

19   charge?

20           MR. ROMANO: Yes, Your Honor.

21           THE COURT: Mr. Malpeso, you're charged with using

22   extortionate means to collect a debt.  Do you understand that?

23           THE DEFENDANT: Yes.

24           THE COURT: You have the right to remain silent.

25   That means that you need not make any statement about the

3

1    charge to anyone.  Any statement you make, except for

2    statements you make to your attorney, can be used against you.

3            You have the right to have an attorney represent you

4    in all proceedings.  If you cannot afford an attorney, the

5    court will appoint an attorney at the court's expense to

6    represent you.

7            I have a notice of appearance by Mr. Romano but it

8    is for arraignment purposes only.  Does that continue to be

9    the case, Mr. Romano?

10           MR. ROMANO: For the moment, yes.

11           THE COURT: I'm reluctant to accept a notice that's

12   limited just to that but what -- in other words, we need to

13   have somebody that can remain in contact [inaudible] the court

14   and the defendant. So until someone else is substituted in or

15   until Mr. Malpeso makes an application for court appointed

16   counsel the court will be looking to you to maintain contact

17   between the defendant and the court.

18           MR. ROMANO: I'll maintain the continuity, Your

19   Honor.

20           THE COURT: All right.

21           MR. ROMANO: I have no problem with that.

22           THE COURT: All right.  What's the Government's

23   position with respect to bail?

24           MS. ARGENTIERI: Judge, it's the Government's

25   position that this is not a bailable defendant. First of all,

4

1  looking at the nature and circumstances of this offense and

2  both the history and characteristics of this defendant.

3          The defendant is charged with extortion, Judge, but

4  this is no small extortion.  The defendant threatened a

5  confidential source over a significant period of time, threats

6  that were captured through consensual recordings, video

7  surveillance and also surveilled by the FBI.  He threatened to

8  kill him.  He put a gun to him which I'll get into in a

9  second, and he used that firearm in furtherance of the

10 extortion which makes this case, Judge, a presumption case,

11 meaning that he's presumed to be both a danger to the

12 community and a risk of flight unless he can rebut that

13 presumption and show that there are conditions of -- bond

14 conditions that can address those concerns.

15         I've spoken with defense counsel.  The bond package

16 he presented to me which is the defendant and his wife and

17 their marital home is insufficient for several reasons.  But

18 first I'd just like to go through what the exact circumstances

19 of this offense is, Judge, which I think you got a flavor from

20 from reading the complaint.

21         This defendant is an associate of the Bonanno

22 family.  He's an enforcer for the Bonanno family and he's a

23 loan shark. How do we know that?  We know that through

24 information provided by confidential sources, by cooperating

25 witnesses, and by the defendant's own statements.  He's caught

5

1    here on tape saying "You borrowed money from gangsters."

2    These are not regular people.  They're gangsters.  We know his

3    nickname with the Bonanno family captain who he's on record

4    with, Anthony Sclafani, who sits with the rest of his crew in

5    the MDC as a result of an arrest on loan sharking charges in

6    October.  Called this defendant one of his twin towers, one of

7    the guys that he sent out to get things done.  The other twin

8    tower was in the MDC and has since been released but he is

9    another big guy who was sent out to enforce for the Bonanno

10   family.

11           Now, on tape he talks about the fact that they sent

12   me, they aren't regular guys, they're gangsters, they want to

13   leave you dead in the street.  He also talks about the fact

14   that he's a loan shark.  If you listen to the tapes, Judge,

15   which I brought today and which I'm prepared to play brief

16   snippets of the recordings so you can just get the flavor of

17   how violent this man is and the violence that he was willing

18   to do to an innocent person on the street in the middle of

19   broad daylight literally.  Sitting outside a pizzeria in his

20   car, Judge, is where this occurred.

21           He talks about his earn.  He says to the

22   confidential source --

23           THE COURT: I'm sorry, his?

24           MS. ARGENTIERI: His earn which is how organized

25   crime defendants talk about how they make money. His earn is

6

1   to put money people out on the street.  He says "These guys

2   won't give me any more money because you won't pay me and I'm

3   not paying them."  Okay.  So in his own words he's a loan

4   shark.

5            When he's arrested, Judge, what does he have with

6   him in the car?  These are the tools of his trade, Judge.

7   This knife, a pipe with a makeshift handle so it doesn't slip.

8   I think the evidence is quite clear of who he is and what he

9   does.

10            Turning to the circumstances of the offense, for the

11   last five years this confidential source has paid over

12   $400,000.00 to this defendant, and where did he end up.  Where

13   did he end up, Judge?  On February 15th he ended up in a car

14   with this defendant. You can hear on the tape the defendant

15   says "Get in the car, get in the car."  He says to the guy

16   "Are you scared?"  The guy said "Yes, I'm scared."  He tells

17   him on the tape "You owe me $115,000.00."  Leading up to that

18   meeting taped conversation, "What do I got to do?  Hit you

19   with a shovel to make you understand what's going on. Is that

20   what I have to do, mash you in the face with a shovel so you

21   really understand the concept of this?"

22            During the consensually recorded meeting which is

23   also video recorded you can see on the video the gun that he

24   takes out of the console of his car and put to the chest and

25   leg of the confidential source during the meeting.  What does

1    he say when he's doing that?  "I'm going to take the cannon I

2    have in this and I'm going to put a hole in you somewhere.

3    Okay.  Just so we're sure.  I'm going to take this and put a

4    fucking hole in you somewhere."  "But why are you going to do

5    that for, for what reason?"  "Because I'm fed up with your

6    bullshit."  He goes on "I'm going to put a hole in you

7    somewhere, either here or at your house.  That's a fucking

8    promise.  They told me if I don't react they're going to

9    react.  So here's what's going to happen.  Either I'm going to

10   put a hole with this fucking cannon in you somewhere or you

11   come up with the fucking money."  "I'm going to come up with

12   the money."  The defendant says "I'm fed up calling you,

13   threatening you, calling your wife." The CS says look "I'll

14   start calling you back."  He says "I don't give a fuck about

15   the phone. I want the money.  What do you want me to tell

16   them?"  "Tell them I'm going to get cash.  I'm going to work

17   for it."  The meeting is over an hour.

18          When he's talking about the cannon, Judge, he's

19   taking the gun and he's pointing it to the source's chest and

20   to his knee.  He says "When are you going to get the money

21   before I plug a hole in you right now.  I'll fucking blow out

22   your kneecap right now and kick you out of the car.  Sal, if

23   you didn't owe this much money I would have fucking clipped

24   you already." He says on the tape he would have killed him if

25   he didn't owe so much money, and what's the most important

8

1   thing for this defendant; his earn.  He wants his money.

2          He says at the end "Now, I'm going to turn these

3   guys on him.  He's going to be dead.  They're never going to

4   find his body and the police are going to come to me and Im

5   going to say I don't know what they're talking about."  He

6   says "I'll fucking kill him" talking about the CS.  "I don't

7   care.  I'll go to jail.  That's my business and I don't care.

8   I'll shoot him and leave him dead in the street and I don't

9   give a fuck.  They'll never trace it back to me.  They can

10  come at me all they want.  I'll never give anyone up and

11  they'll be guys behind me left and right coming after him if

12  he's not dead."

13          THE COURT: Where is that conversation occurring?

14          MS. ARGENTIERI: That's in the car, Judge, which --

15          THE COURT: This is --

16          MS. ARGENTIERI: Yes.

17          THE COURT:  -- a discussion with your source about

18  someone else.

19          MS. ARGENTIERI: With the source -- no, about the

20  source.  What happened is, Judge, the source blamed a loan

21  shark debt on a friend of his to sort of diffuse the blame.

22  So during the conversation in the car they called the friend

23  on speaker phone and now Mr. Malpeso is trying to extort the

24  friend to pay the debt as well.  So he's talking to the friend

25  on the phone, and I can play it for you, Judge, if you think

1  it will make it clearer.  He says --

2           THE COURT: I understand the context.

3           MS. ARGENTIERI: He's talking about the confidential

4  source.

5           So this is not some kind of bare bone loan sharking

6  case.  It's not a case where it's a he said/she said.  It's

7  all on tape. It's on videotape, consensual recordings, and

8  it's backed up by frankly the evidence we found in his car.

9  Those are the tools of a loan shark.

10          Now, it's our position that there's no way he can

11 rebut the presumption that he has to in this case.  There's no

12 bail package that can neutralized the threat, not home

13 detention and not home detention with a bracelet.  That's for

14 several reasons, Judge.

15          The Second Circuit has a body of case law regarding

16 organized crime defendants, organized crime cases.  The

17 problem is because of the network that exists for these people

18 all they have to do is make a phone call, Judge, and they can

19 someone at their disposal and that's exactly what the

20 defendant said he was going to do. Even if I get locked up

21 there's going to be someone right behind me.

22          The other -- my other concern, Judge, is that his

23 wife is not an innocent party to this either.  She profited

24 from it.  The CS was paying $6,500.00 a month and $750.00 a

25 week on a regular basis to this defendant.  They live in a

10

1   nice house.  I know he's going to talk about the settlement

2   that he got and that's how they paid for his house and he got

3   some settlement two years ago but this is also contributing to

4   their lifestyle.  The defendant himself puts his wife in it

5   saying on the phone to the cooperating witness, My wife and I

6   are brawling over the past week over this because the CS is

7   not paying the money. She wants to go to your house and

8   fucking beat your wife up for putting me through this.  Okay.

9          So not only is she aware of the extortion, she's

10  annoyed that her family is not getting the money that she's

11  entitled to which frankly makes her an inappropriate surety in

12  this case.  It's my understanding she's the only other person

13  of all the people that he knows willing to come to court to

14  sign for him today.  So his bond package is willfully,

15  willfully inadequate, Judge, and that's our position.

16          THE COURT: Mr. Romano.

17          MR. ROMANO: Yes, Judge.  Thank you.

18          Judge, just to start with the bail package and I'll

19  finish it off as well.  The prosecutor mentioned and we showed

20  documents that show the deed, the mortgage statement and the

21  appraisal.  Showed them to Ms. Argentieri.  She interviewed

22  the wife who's in court who's the suretor who brought all

23  those documents.  The house is $899,000.00.  It has a mortgage

24  of $396,000.00.  Rough math we're proposing a $500 million

25  home.

11

1          THE COURT: $500,000.00 I think.

2          MR. ROMANO: $500,000.00.

3          THE COURT: You said $500 million.

4          MR. ROMANO: $500,000.00 which is the equity, I'm

5    sorry, in the house.  So that's our initial proposal, Judge.

6    The house is co-owned by Mr. Malpeso.  It's owned by the wife

7    Ruth who's in court as well.  So we prepare -- if the court

8    approves our package after argument to put it up, sign the

9    confession of judgment and file it, and we also brought Mr.

10   Malpeso's passport.  We're prepared to surrender that as well.

11   Travel restrictions and any other conditions the court deems

12   appropriate.

13          I would note, Judge, that I had an opportunity to

14   review the Pretrial Services Report and they do recommend bail

15   despite all the -- the very articulate bail application by the

16   Government.  They do recommend that bail be set.

17          I'd like to point out, Judge, I had an opportunity

18   to read the complaint and from the complaint, Judge, you'll

19   notice -- it's actually in the first paragraph.  You'll see

20   the conduct, according to the paragraph, ended on February 26,

21   2009.  So of all the dangerousness situations that have

22   occurred here they've allowed this defendant to remain in the

23   community for almost a full year, for a full twelve months,

24   and now fast forward to 2010 they want to tell this court how

25   dangerous he is.

12

1          MS. ARGENTIERI: If I may, that's just a typo.

2          THE COURT: Wait a minute.  Let Mr. Romano finish and

3   you'll get your chance to rebut.

4          MS. ARGENTIERI: Okay.

5          MR. ROMANO: Thank you, Judge.

6          They allowed this defendant, although the conduct

7   according to the sworn complaint by the FBI and apparently all

8   of a sudden now after it's been reviewed by let's say give

9   government officials it's now a typo but -- and I'm the only

10  one who apparently saw this.  But according to the complaint

11  it ends in 2009 and that means this defendant was allowed to

12  remain free even though he's this very dangerous character

13  and --

14          THE COURT: I really think you're wasting your time

15  here.  Sorry.  Because I think the rest of the complaint makes

16  it pretty clear that there were consensual recordings as

17  recently as February 15th of this year.  So I don't -- that's

18  not going to get you anywhere.

19          MR. ROMANO: As far as background and history and

20  characteristics, this defendant has lived in the Eastern

21  District his entire life.  He's lived part of his life in

22  Brooklyn. He's resided in Staten Island for the last eleven

23  years.  He's married.  He has three children.  He has a

24  daughter who is seven years old.  He has twin sons who are

25  two-and-a-half years old.  The wife Ruth is here is a

13

1   housewife.  Mr. Malpeso was a carpenter by trade. He was

2   severely injured in a work related accident and fell off a

3   ladder.  As a result of that he received two back surgeries.

4   He has disks removed from his back because he was in severe

5   pain.  He's had left knee operations.  He has to go for a

6   third one. He requires a knee replacement.  He's on

7   medication.

8          He has, according to the agents who took him to the

9   hospital yesterday, he has severe high blood pressure.  His

10  blood pressure was 180/120 and it was dangerously high in

11  addition to -- he takes medication regularly for pain which is

12  prescribed by his doctor.

13         Judge, the vehicle was searched pursuant to a search

14  warrant.  Ms. Argentieri has displayed two different items but

15  conspicuous in its absence is there is no gun and that

16  would -- I'm sure she would love to actually display a gun or

17  a picture of a gun in court and say look, this is what we

18  found in the car, just what we were looking for.  As you know,

19  Judge, according to the Government's rendition of the facts,

20  the items she displayed weren't used in any commission of a

21  crime.

22         Now, assuming for argument sake -- there is no real

23  evidence that a) it was a real gun, that it wasn't a toy gun,

24  it wasn't a BB gun which wouldn't be defined under the

25  category of a firearm.  If the gun was operable, whether there

1  was ammunition in the gun.  So there's a lot of different

2  factual scenarios as far as the weapon is concerned that

3  doesn't lead -- it shouldn't lead to the court to believe

4  well, he had a gun, it was loaded and he was ready to use it.

5  Simply there is no evidence.

6          What was interesting, Judge, and according to the

7  complaint the meeting with the CS and Mr. Malpeso in the

8  vehicle took place for 90 minutes.  Now, as you know, Judge,

9  it just can't speak of a person who's going to come to court

10  and say I was so fearful, I was so afraid and he remains in a

11  car for 90 minutes and according to the complaint the FBI was

12  nearby either videotaping, audiotaping or both.

13          Now, logically speaking, Judge, if a gun is

14  displayed and they feel their CS at any point in time is in

15  need or in danger do you think they would continue videotaping

16  and say I hope we get a good angle on this, I hope we get it

17  on tape if it really happens, or do you think maybe they would

18  spring into action and intercede and stop what they perceive

19  as a dangerous situation.  I respectfully submit, Judge, they

20  didn't perceive the situation to be dangerous or as dangerous

21  as portrayed by the Government. Otherwise they wouldn't allow

22  it -- the situation to proliferate for a full 90 minutes in a

23  vehicle.

24          Judge, according to the defense this colorful

25  language, these threats are built into the offense already.

1  That's why we're in front of the court is because they like

2  these fact patterns and you need this colorful language

3  because that's what really drives the statutes here.  When a

4  CS goes to the Government there's a certain scripted language

5  that they use to aggravate a situation because they want that

6  colorful language and they need it and they could make

7  applications about how dangerous this person is.

8            What happens -- when this incident, according to the

9  complaint now, happened in 2004 there is no acts of violence,

10 anything that is reportable until the tape recorded

11 conversations in February of 2010 because apparently the CS

12 went to the FBI and they do a very good job in having the CS

13 follow a script and that's the way the play book goes and this

14 is sort of the end result and you get that language on the

15 telephone.

16            Judge, I'd like to point out that according to the

17 guideline calculations, if you do a calculation here, Judge,

18 now the Government uses the word use when they describe a gun.

19 The base offense level for this is a Level 20 and the statute

20 calls -- and the guideline calculations discuss a person who

21 allegedly either brandishes, displays or some -- or shows a

22 gun during the offense.  If that occurs they add 3 points to

23 the given offense. So if you have a 20 plus a 3 and you still

24 subtract 3 for acceptance of responsibility you wind up with a

25 20 which is according to what I read it's 33 months is the

1  type of sentence that this would call for.

2       Now, the Government says well, it's a loaded gun,

3  it's consecutive time, he's going to get all sorts of very

4  egregious sentences when the guidelines speak otherwise.

5       Judge, if you look in the footnote in the complaint

6  and it's actually very important because in the complaint it

7  says the agents were observing this incident for approximately

8  90 minutes and the footnote says a gun was briefly displayed,

9  not that it was out the entire 90 minutes, not that this

10 person was under the threat of physical violence for a full 90

11 minutes but it says it was only briefly displayed.  Judge,

12 that's on Page 8 in a footnote where the use -- the video

13 captured Malpeso holding a handgun during the February 15,

14 2010 meeting.  So it sort of contradicts -- the agent's

15 affidavit sort of contradicts the Government's rendition of

16 the facts.

17      Judge, when we talk about dangerousness, Judge, the

18 Government went on to say that this defendant is an enforcer

19 for the Bonanno crime family. Well, that's interesting, Judge.

20 We have a one count indictment. It doesn't name any other

21 victims.  They said this defendant has a loan shark business.

22 It doesn't name any other victim.  I'm sure the FBI very

23 thoroughly investigated what the situation was.  So they just

24 haphazardly throw this terminology around, the defendant is an

25 enforcer.  What did he do in connection with that conduct?

1  Here's the confirmatory test.  Starting in 2002 the Government

2  had prosecuted over a hundred people, made members of the

3  Bonanno crime family in this courthouse.  They've had ten high

4  ranking members of the Bonanno crime family who cooperated

5  with the Government, including the boss, the underboss, third

6  in command, captains and all the way down.  This defendant

7  doesn't appear anywhere on the radar in any debriefings

8  regarding any captain, underboss, associate, boss or whomever

9  about conduct he's done, and the Government knows that.  So

10  historically in this courthouse Judge Garaufis has had at

11  least a hundred different Bonanno related defendants in the

12  courthouse and this defendant never appears anywhere on the

13  radar.  Now we fast forward to 2010 the Government says well,

14  he's an enforcer and they have nothing at all to back that up.

15          In addition to, Judge, if you take a person and you

16  say well -- and it's easy to do.  Well, this defendant is in

17  the loan sharking business.  Well, you know, what's the loans,

18  what the terms, did you seize any records in his vehicle, who

19  are his victims, how long has this been going on, and they

20  have no evidence or no answers to tell this court other than

21  the fact well, he's a loan sharker, he's in the business, he's

22  an enforcer.  Well, okay, what do you have to back that up?

23  What do you use to substantiate that?

24          Now, they take the standard dangerousness to the

25  community. They feel this defendant is a danger.  Right.

1  There's no conditions or combination of conditions which would

2  effectuate his release.  Now you go to the Bail Reform Act and

3  the Bail Reform Act tells us well, there's a small

4  identifiable group of people who are involved in organized

5  crime, that that Bail Reform Act speaks and they say look,

6  these people in this -- who are in organized crime and this

7  defendant by all [inaudible] is not in organized crime.  He's

8  not a member of any criminal enterprise or any criminal group.

9  Now the Government wants to say you know what, we're going to

10  lump you into that identifiable group even though this is not

11  a racketeering case.  There's no actual violence.  There's

12  talk of violence but there's no actual violence in this case.

13  The CS, not a hair on his head was ever touched.  Maybe the

14  colorful language was alarming.  However, Judge, you have to

15  look at what actually happened.  The FBI was on standby I

16  guess as prevention mode to prevent anything from happening,

17  and once the person, the CS is the under protection of the

18  Government they weren't going to allow anything to happen.

19       So although the language was there if the tape is

20  accurate, and I haven't heard it, but it's interesting to say

21  well, the defendant used the gun, yet he displayed a knife.

22  She has this giant screw with some tape on it but the

23  defendant was going to hit the guy with the shovel. So it just

24  defies logic as to -- is Mr. Malpeso just a big mouth, is he

25  just a blow hard, does he just talk a lot, is he just

1   aggravated, is he upset.  Maybe he's all those but the issue

2   well, is he really dangerousness and can we overcome the

3   presumption of dangerousness, and I respectfully submit we

4   can.

5           You look at the factors, Judge, and you look at the

6   defendant's background and you look at his history or lack

7   thereof and you look at his family ties and his roots in the

8   community and the fact that he will come back to court and he

9   will deal with these charges and the fact that the Government

10  is telling us there's a gun but they really don't have a gun

11  and there's no evidence that it was a real gun.  It doesn't

12  fall under the statute of a firearm.  It may just simply be a

13  dangerous weapon if one at all.

14          Just focusing again on the Bail Reform Act, Judge,

15  Ms. Argentieri spoke about the Circuit and how the Circuit

16  routinely issues directives and case law and remands people,

17  but those are more focused on leaders of organized crime where

18  they have this alleged network of people where there's a

19  pattern of criminal activity that continues.  There's nothing

20  in this complaint that says this is a continuing ongoing

21  criminal enterprise, Judge, or that he's involved in anything

22  else except what we see in the complaint.

23          Now, Judge, I submit we are again prepared to submit

24  the marital home as bail.  There's half a million dollars in

25  equity.  The wife is here to sign the bond.  The defendant

20

1  could sign a bond.  I'm sure Pretrial supervision would be

2  appropriate.

3          What's important to note, Judge.  There has been a

4  lot of people who are charged with a lot worse criminal

5  activity who have been released on bail and have abided by the

6  terms and conditions of the directives of the court and I'm

7  sure Your Honor has released those types of people, whether

8  they're of an Italian extraction or otherwise who have been

9  released on charges involving murder and other equally as

10  serious crimes, and those defendants have always come back to

11  court and dealt with their issues in the correct forum, Judge.

12          The Government has one potential victim, the CS

13  who's mentioned unnamed in the complaint.  Is the community

14  really shaking at its core or is this one complaining witness,

15  this CS able to be taken care of by the Government where this

16  conduct will cease and desist immediately.

17          I respectfully submit, Judge, this defendant is not

18  a risk of flight.  There is nothing to suggest that he is and

19  he is not a danger to the community.  Language alone in my

20  opinion, although colorful, is simply not enough to detain

21  this defendant in the MDC based on his history, his

22  characteristics, his significant medical condition, and the

23  bail package we've proposed.  If Your Honor would impose any

24  other conditions, if the court thinks electronic monitoring is

25  appropriate, Pretrial Services has mentioned that in the

21

1   report, of course we would adopt Your Honor's directives.

2   Thank you.

3            THE COURT: Anything you wanted to add, Ms.

4   Argentieri?

5            MS. ARGENTIERI: Judge, nothing that the defense

6   counsel just said rebuts in my view the Government's view

7   regarding the presumption in this case.  At some point it's

8   just completely predictable, right.  We have the gun on a

9   video.  He says oh, that contradicts what you said because it

10  was just briefly on the video.  Well, it is briefly on the

11  video but what that does is it corroborates what the

12  confidential source tells us is going on in the car.  Now it's

13  like well, no one was going to get hurt because the FBI was

14  there and they were monitoring him.  If we didn't have the gun

15  on the tape they'd be like there's no gun.  Now the gun is on

16  the tape.  So like maybe it's not a real gun.  Really?

17  Produce it.  Produce the fake gun that he used.  I mean what

18  exactly -- [inaudible - away from microphone] but he didn't

19  use [inaudible] use it for, Judge.  What was he going to use

20  them for exactly, this knife?

21           MR. ROMANO: He's a carpenter.

22           MS. ARGENTIERI: Right.  A knife for carpentry?

23           THE COURT: Ms. Argentieri and Mr. --

24           MS. ARGENTIERI: With brass knuckles on it.

25           THE COURT: I'm not a jury.

22

1          MS. ARGENTIERI: I know, Judge.

2          THE COURT: You don't have to -- go ahead.

3          MS. ARGENTIERI: Just briefly, Judge.  He says -- he

4     refers to this as an indictment.  It's actually not an

5     indictment.  It's a complaint.  As is our practice in the

6     Eastern District of New York we don't put every single charge

7     that we're thinking of in the complaint.  We start off with

8     some of the most serious charges.  Here, extortion and he used

9     a gun and that is quite clear from the tape.

10          Mr. Romano asked what did he do, what did he do that

11     was so bad.  Well, the Government submits that what he did was

12     so bad is he threatened someone at gunpoint and ruined a man's

13     life.  He wants to hide behind the family.  He's got young

14     kids.  He should have thought about those young kids five

15     years ago when he -- at least the Government is aware of --

16     entered the loan sharking business.

17          I'm not exactly sure what Mr. Romano was talking

18     about when he said that Mr. Malpeso's name never come up

19     before but in my view he doesn't have access to all 3500 that

20     the Government does and the Government is proffering that

21     there are cooperating witnesses and confidential sources who

22     will say that he's an associate of the Bonanno family who's

23     looking to get straightened out and that he was in Anthony

24     Sclafani's crew and that he's a loan shark and that he's an

25     enforcer for the mob.

1          Judge, if there's any question in your mind about

2    what happened on these tapes and the FBI giving him a script,

3    I would just ask you to allow me to play portions of the tape

4    for you.  You can hear exactly who this defendant is because

5    really he says it best.

6          THE COURT: I don't -- I've heard enough.  You've

7    both had ample time to say what you wanted to say.  I've heard

8    enough and I'm not prepared to take a chance that Mr. Malpeso

9    will not follow up on his threats.  So I believe the

10   Government satisfied me by clear and convincing evidence that

11   he poses a danger to a person in the community and perhaps to

12   others but certainly to at least one person in the community

13   and that no combination of conditions can alleviate that

14   threat.

15         MR. ROMANO: Would strict house arrest with bracelet,

16   electronic monitoring?

17         THE COURT: I considered it all.  I've granted the

18   Government's motion for detention and I believe they've

19   satisfied me by clear and convincing evidence that Mr. Malpeso

20   poses a danger to a specific person in the community and

21   therefore -- and no combination of conditions can alleviate

22   that danger.

23         Have you discussed with Mr. Malpeso the scheduling

24   or preliminary hearing, Mr. Romano?

25         MR. ROMANO: I haven't, Your Honor.

24

1          THE COURT: You have not?

2          MR. ROMANO: I have not.

3          THE COURT: If you want to discuss it now you can or

4    we can schedule it and then you can choose to waive it at a

5    future point.

6          MR. ROMANO: Sure.  Let's schedule it.

7          THE COURT: It will be scheduled for two weeks from

8    today, March 17th.

9          MR. ROMANO: Judge, just as far as medical issues are

10   concerned, this defendant again --

11         THE COURT: We will note the fact that you say he

12   suffers from high blood pressure.

13         MR. ROMANO: High blood pressure.

14         THE COURT: Do you have particular medications that

15   we can advise the MDC about?

16         MR. ROMANO: He's on painkillers.  He's on Oxycodone

17   for his back and his knees and those are two items --

18         THE COURT: I'll also say that he's been prescribed

19   pain medication for back and knee injuries, right?

20         MR. ROMANO: Yes.

21         THE COURT: We will make a note of that as well.  Are

22   there any specific medications for the high blood pressure?

23         MR. ROMANO: Judge, when he was arrested he was taken

24   to the hospital. His blood pressure was 180/120.  When he was

25   released back into custody they suggested that he see a doctor

1   within 48 hours.  So if you could order that he -- his blood

2   pressure is monitored and prescribe any medication as needed

3   and --

4                    [Pause in proceedings.]

5            MR. ROMANO: Judge, I would note, and just as an

6   aside, this defendant was housed in the shoe unit and we would

7   ask that the court recommend that he be put in population in

8   the dorm for the simple reason he --

9            THE COURT: I am unable to make those determinations

10  to the Bureau of Prisons.  I don't know what led them to do

11  that but the Bureau of Prisons makes judgments about that --

12           MS. ARGENTIERI: Judge, actually he was just held in

13  the shoe because that's where they have people overnight.  He

14  wasn't technically in the custody of the Marshals.

15           THE COURT: Well, there's your answer.  If that

16  persists then you can discuss it with ms. Argentieri and then

17  if there's a basis for me to review that or for the Magistrate

18  Judges to review that determination then you -- I certainly

19  won't prevent you from making an application but at this point

20  I'm not in a position to make a recommendation.

21           MR. ROMANO: Judge, just for the record, he was in a

22  cell last night and there was apparently feces all over the

23  walls in the facility and there was feces on the mattress that

24  they put on the floor to sleep on and there was a non working

25  toilet which apparently was full to the rim with other items

26

1    and non usable.  So it was really disgusting conditions.

2             THE COURT: All right.

3             MR. ROMANO: So if we can put the defendant in a

4    dorm.

5             THE COURT: As I said, Mr. Romano, I am not in a

6    position to recommend to the Bureau of Prisons to do anything

7    specific with Mr. Malpeso.  I hope that the circumstances

8    improve.  If they don't then you certainly can bring that back

9    to our attention.

10            MR. ROMANO: Thank you.

11            THE COURT: All right.  Is there any other matter to

12   address today?

13            MS. ARGENTIERI: No, thank you, Judge.

14                         *  *  *  *  *

15

16

17

18

19

20

21

22

23

24

25

27

1      I certify that the foregoing is a court transcript from

2   an electronic sound recording of the proceedings in the above-

3   entitled matter.

4

5   _____

6                              Shari Riemer

7   Dated:   March 18, 2010

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25